# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DISTRICT

|  |  |  |
|---|---|---|
| DEMETRICE THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:19-cv-00407-LSC |
| | ) | |
| ALABAMA ONE CREDIT UNION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF OPINION

Demetrice Thomas sued his former employer, Alabama One Credit Union (The Credit Union), under both federal and state law. (Doc. 2.) The Credit Union has before the Court a motion for summary judgment (Doc. 28) and a motion to strike (Doc. 35). As explained below, The Credit Union's motion for summary judgment is due to be GRANTED, and its motion to strike (Doc. 35) is due to be DENIED IN PART and TERMINATED AS MOOT IN PART.

## STANDARD OF REVIEW

A successful summary-judgment movant shows there is no genuine dispute as to any material fact and that he, she, or it deserves judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists, and summary judgment is

not appropriate, if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F. 3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)).

At summary judgment, trial courts never weigh evidence. *Standifer v. Best Buy Stores, L.P.*, 364 F. Supp. 3d 1286, 1294 (N.D. Ala. 2019). We instead "view all evidence" and draw "all justifiable inferences" in the non-moving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then, we determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250–251 (1986).

## BACKGROUND

The Credit Union hired Thomas on January 28, 2013. (Doc. 30–1 at 167.) Thomas, an African-American male, initially worked as an IT Specialist. (*Id.*) His 2014 year-end review rated him "Above Average" (Doc. 30–6 at 4); management said he "worked well with" team members and said he had strong technical knowledge. (*Id.* at 2–4.)

State regulators placed The Credit Union under conservatorship in August of 2015.[1] (Doc. 30–14 at 14.) As a conservatee, The Credit Union lost operational independence (*id.* at 47–48)—state agents approved all hiring, firing, and promotional decisions and created new positions when necessary. (*Id.*) State agents even fired The Credit Union's Chief Information Officer (CIO), Tim Powell. (Doc. 30–1 at 36–37.) Rather than replace Powell, conservators hired two independent contractors, Vichael Fleming and Robert Long, to temporarily lead the IT Department. (Doc. 30–16 at 14–20; Doc. 30–17 at 27.)

In December 2015, The Credit Union and its conservators promoted Thomas to Network & Systems Specialist II. (Doc. 30–1 at 167–69.) With the new position came more responsibility and more pay. (*Id.*) Still ambitious, Thomas spoke with Brittany Dickey, The Credit Union's Human Resources Manager, in late 2015 or early 2016 and told her he was interested in the CIO position once held by Tim Powell. (Doc. 30–1 at 41.) Dickey told Thomas the CIO position "was not open yet," but she promised to tell Thomas if and when it became available. (*Id.*) Dickey relayed

---

[1] If "necessary to conserve the assets of any state-chartered credit union," Alabama regulators may "appoint the Alabama Credit Union Administration or the National Credit Union Administration as conservator and immediately take possession and control of the business and assets of any state-chartered credit union." Ala. Code. § 5-17-8(f). "The conservator shall have all the powers of the members, the directors, the officers, and the committees of the credit union and shall be authorized to operate the credit union in its own name or to conserve its assets in the manner and extent authorized by the administration." Ala. Code. § 5-17-8(l).

Thomas's interest in the CIO position to the conservator's agent, Bill Wells. (*Id.* at 221.)

In April 2016, Fleming and Long recommended the conservators create a new IT position and hire John King, a Caucasian male. (Doc. 30–14 at 93–94.) According to Fleming, he and Long recommended King because of his experience. (Doc. 30–16 at 33). King had worked for multiple credit unions, both in accounting and IT, and had experience managing a credit union department. (*Id.*) Conservators accepted the recommendation and hired King to a non-managerial IT position. (Doc. 30–17 at 31–32.)

Although the CIO position was never filled, conservators and The Credit Union promoted King to "IT Director" in December 2016. (Doc. 30–16 at 57.) As Director, King assumed some, if not all, the duties of CIO. (Doc. 30–1 at 215.) Just as all IT personnel formerly reported to the CIO, all IT personnel reported to the IT Director. And, as Director, King managed the department's day-to-day operations—just like the former CIO. HR Director Dickey admits The Credit Union never posted the Director position or asked Thomas if he wanted to apply. (Doc. 30–14 at 93.) Because The Credit Union never posted the Director position—a position that subsumed many responsibilities of CIO—Thomas believes The Credit Union promoted King because of his race. (Doc. 34 at 24–25.)

In both 2015 and 2016, Thomas received an "Excellent" overall rating. (Doc. 30–7 at 4–6.) In 2016, management called Thomas a quick learner and said he had "strong technical knowledge." (*Id.*) Thomas correctly suspected his 2017 review would be different. (Doc. 30–1 at 188–89.) After warning Thomas his 2017 rating was "the most difficult" in IT, King rated him "Average" or "Needs Improvement" in eleven categories. (Doc. 30–7 at 7–8.) Overall, Thomas earned an "Average" rating on The Credit Union's new evaluation model, which The Credit Union adopted after conservatorship ended in 2017. (*Id*; Doc. 30–1 at 190.) Until 2017, evaluators started at "Excellent" and deviated downward. (Doc. 30–17 at 53–56.) To reflect "industry practice" and company expectations, Fleming and Long told evaluators to, beginning in 2017, start at "Average" and deviate up or down from there. (*Id.*) According to Long, all IT employees fared less well under the 2017 model. (*Id.* at 56.)

Thomas blames race, and not the new model, for his 2017 scores. (Doc. 30–1 at 197–98.) His race theory rests on one piece of evidence: he spoke with two white employees (Colby Dobbins and Preston Brown), and both said Thomas's review "was worse than theirs." (*Id.*) Thomas admits, however, that he never saw Dobbins's or Preston's reviews. (*Id.*)

In addition, Thomas claims he suffered sexual harassment. He says female employees commented on "the bulge" in his pants, sent him unwanted texts, letters, and emails, complimented his appearance, and one allegedly exposed herself to Thomas. (*Id.* at 95–100, 106–07.) Another female employee used The Credit Union's "iPower" system to access some of Thomas's information without his consent. (*Id.* at 145–47.) According to Thomas, this employee used the iPower software to access his name, address, phone number, and date of birth. (*Id.*) Thomas reported some of this alleged harassment to HR Manager Dickey, some to an HR assistant, and some to then-IT Director King. (*Id.* at 95–96, 98–101, 111.)

According to Thomas, sexual harassment was the final straw. (*Id.*) ("The sexual harassment, the things that were being said to me sexual harassment-wise kind of like turned me away . . . ."). In 2018, Thomas left for a new position that paid $20,000 more per year. (*Id.* at 81–82.) Because Thomas, as an IT Specialist, could access sensitive information, The Credit Union did not allow Thomas to work his two-week notice period. (*Id.* at 83.) Still, The Credit Union paid Thomas for those two unworked weeks in lieu of him working. (*Id.*) Thomas admits it is not unusual for companies to not allow IT professionals to work and access company information once they resign. (*Id.* at 84.) Thomas also admits he has no direct evidence that race or sex influenced The Credit Union's notice-period decision. (*Id.*)

## ANALYSIS: SUMMARY JUDGMENT MOTION

Thomas sued The Credit Union under both federal and state causes of action. (Doc. 2.) The Court addresses the federal claims first and the state claims second.

## I.      Racial Discrimination

Thomas alleges three varieties of racial discrimination: failure to promote, wage/evaluation discrimination, and failure to "allow [him] to work out [his] two-week notice period."[2] (*Id.* at 7–10.) He brings all three claims under both Title VII, 42 U.S.C. § 2000e, et seq.,[3] and 42 U.S.C. § 1981.[4] (*Id.*) With respect to racial discrimination, Title VII and § 1981 claims "are analyzed in the same manner." *Hill v. Emory Univ.*, 346 F. App'x 390, 394 (11th Cir. 2009) (citing *Rice-Lamar v. City of*

---

[2] Thomas's reply brief includes a few conclusory retaliation arguments. (Doc. 34 at 27) ("AOCU made employment decisions based on discriminatory and retaliatory reasons."); (*Id.*) ("Moreover, the stigma associated with the early termination is manifest and AOCU did so in retaliation against Thomas for his previous complaints against Fleming and AOCU."). But because Thomas's Amended Complaint (Doc. 2) contains no Retaliation Count, the Court does not consider these conclusory statements. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

[3] Title VII provides, in relevant part: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e(a).

[4] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

*Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000)). For both, the claimant must show his or her employer acted with discriminatory intent. *See Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (successful § 1981 claims show "that the defendant intended to discriminate on the basis of race"); *Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (through direct or circumstantial evidence, Title VII disparate-treatment cases "require proof of discriminatory intent"). Thomas admits he has no direct evidence of discriminatory intent. (Doc. 30–1 at 84, 198–99, 208, 213).

Although he lacks direct evidence, Thomas can show discriminatory intent through *McDonnell Douglas*'s burden-shifting framework. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018). Under *McDonnell Douglas*, Thomas first must establish a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Then the burden shifts to The Credit Union to produce a "legitimate, nondiscriminatory reason" for the alleged wrong. *Id.* This burden is "exceedingly light." *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (citations omitted). If The Credit Union proffers a nondiscriminatory explanation, the burden shifts to Thomas to show that explanation is a pretext for discrimination. *Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

### A.   Failure to Promote

A prima facie failure-to-promote case has four elements. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005). First, the plaintiff must belong to a protected class. *Id.* Second, the plaintiff must be qualified for and apply for a position the employer sought to fill. *Id.* However, if an employer hires through an informal process, the plaintiff need only show (a) that he was qualified for the position and (b) that "the company had some reason . . . to consider him." *Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 533 (11th Cir. 1992). Third, the employer must reject the plaintiff. *Vessels*, 408 F.3d at 768. Finally, the plaintiff must show the position was filled with someone outside his protected class. *Id.*

Thomas established a prima facie case. First, The Credit Union concedes Thomas belongs to a protected class (African-American). (Doc. 29 at 15.) Thomas also met element two. HR Manager Dickey admits The Credit Union never posted the IT Director position or accepted applications for it. (Doc. 30–14 at 108, 111.) Therefore, the informal-application exception applies; Thomas need only show (a) he was qualified and (b) The Credit Union "had some reason" to consider him. *Jones*, 977 F.23 at 533. Thomas submitted evidence that he was qualified. The IT Director job description at least five years of "similar or related experience," a college degree, strong "interpersonal skills," and "thorough knowledge of hardware

systems" as requirements. (Doc. 30–17 at Ex. 2.) According to his resume and performance reviews, Thomas had at least three years of IT experience and more than four years of non-IT management experience (Doc. 30–15 at 24–25), a bachelor's degree in Information Systems (*id.*), he interacted well with colleagues (Doc. 30–6 at 2), and he had "broad technical knowledge" (Doc. 30–7 at 6). Although Thomas never applied for the IT Director position, The Credit Union "had some reason" to consider him. After all, he told Dickey he "wanted to apply" for CIO, and, according to Thomas, the IT Director subsumed the CIO's duties. (Doc. 30–1 at 215.) Finally, The Credit Union rejected Thomas and instead promoted a Caucasian outside Thomas's protected class. Viewing the evidence in Thomas's favor, he meets all four elements of a prima facie case. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (explaining how the prima facie burden "is not onerous").

Because Thomas established a prima facie case, the burden shifts to The Credit Union to produce a non-discriminatory reason for promoting King over Thomas. *See Watkins v. Sverdup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (the employer's burden is one of production, not persuasion). The Credit Union's proffered non-discriminatory reason is that King was better qualified. (Doc. 29 at 16.) According to Fleming, King worked at Legacy Credit Union for ten years, had

experience in Legacy's IT department, and managed Legacy's accounting department. (Doc. 30–16 at 33–34.) In total, King had over six years of management experience and more than seventeen years of credit union experience. (Doc. 30–18 at 3.) Fleming explained why those qualifications mattered:

> **Fleming**: The fact that he worked in the accounting area was very—to me was very important.
>
> **Q:** Why was that?
>
> **Fleming:** In a credit union in IT, especially a small credit union like Alabama One, typically somebody in IT—maybe multiple people work closely with accounting. And it's very important for them to understand the core product and how the core product touches accounting. So that's a valuable skill set to have . . . And also he had worked in IT at Legacy and it looked like he had a good skill set there. He had just finished an online banking, home banking conversion. And that was interesting to us too because we knew that we had . . . mobile banking conversion coming up.

(Doc. 30–16 at 33–35.) Unlike King, Thomas had no accounting experience and had never managed a credit union department. (*See* Doc. 30–15 at 24–25.) Because it showed King had relevant experience that Thomas lacked, The Credit Union produced a non-discriminatory reason for not promoting Thomas. *See Summerlin v. M&H Valve Co.*, 167 F. App'x 93, 95 (11th Cir. 2006) (accepting that qualification is a legitimate, nondiscriminatory reason for promotion decisions).

Under *McDonnell Douglas*, the burden shifts back to Thomas to show pretext. *McDonnell Douglas*, 411 U.S. at 804. He can show pretext "either directly by

persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256). "If the [employer's] proffered reason is one that might motivate a reasonable employer, [an employee]. . . must meet it head on and rebut it" by "producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Thomas did not produce sufficient evidence to rebut The Credit Union's proffered explanation.

Thomas first argument for pretext—that he "was qualified to lead the IT Department as the CIO or It Director" (Doc. 34 at 25)—falls short. "A plaintiff cannot prove pretext by simply arguing or even showing that he was better qualified than the person who received the promotion." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). Instead, a plaintiff must show "the disparities between the successful applicant's and his own qualifications 'were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quoting *Cooper*, 390 F.3d at 732). Thomas, unlike King, (1) had never managed a credit-union department, (2) had no managerial accounting experience, and (3) had no experience

working in other credit unions. (Doc. 30–15 at 24–25.) A reasonable person exercising impartial judgment could, therefore, prefer King's qualifications over Thomas's.

Thomas's second argument, that The Credit Union deviated from its policies by not posting the IT Director position (Doc. 34 at 25), is also insufficient to rebut The Credit Union's explanation. "Even where preselection violates corporate personnel policies, it does not necessarily indicate racial discrimination." *Springer*, 509 F.3d at 1350 (citing *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979)). Preselection is even less likely to show pretext when decisionmakers have "first-hand knowledge of the potential applicants." *Id.* Here, Fleming, Long, and Dickey had first-hand knowledge of Thomas and his credentials; they supervised and evaluated him for years. They also had first-hand knowledge of King's credentials in that he worked for The Credit Union before his promotion to IT Director. Because of that first-hand knowledge, "posting the position would have been superfluous" to the decision-making process. *Id.*

Thomas neither persuaded the Court that King's promotion was racially motivated nor produced "sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by" The Credit Union. With little evidence of pretext, and with no other circumstantial evidence of discriminatory

intent, summary judgment as to Thomas's failure-to-promote claim is due to be granted. *Cooper*, 390 F.3d at 732 ("Again, we do not sit in judgment of the wisdom of an employer's selection.").

### B.   Wage and Evaluation

In 2017, unlike in prior years, Thomas received an "Average" overall performance rating. (Doc. 30–8.) His total score dropped sixteen points from the prior year (Doc. 30–18 at ¶ 27), and his evaluation listed several areas needing improvement: "Demetrice needs to increase his availability [and] needs to master his area of Networking and Security." (Doc. 30–8 at 2.) Because The Credit Union tied 2017 evaluations to pay raises (Doc. 30–14 at 122), Thomas's lower evaluations resulted in a lower pay raise. Thomas believes race motivated both the evaluation and the lower pay raise. (Doc. 34 at 27.)

To establish a prima facie case of race discrimination, a plaintiff must show (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees who are not members of his class more favorably; and (4) he was qualified for the job or job benefit at issue. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842–43 (11th Cir. 2000). The Credit Union challenges only the third (similarly situated comparator) and fourth (qualification) elements. (Doc. 29 at 20.) To satisfy the "similarly situated"

element, Thomas must proffer a comparator who is similarly situated "in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019). While the precise "similarity" is "to be worked out on a case-by-case basis," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

Thomas offered two similarly-situated Caucasian comparators (Dobbins and Brown) whom he contends The Credit Union treated more favorably. For three reasons, Dobbins and Brown were similarly situated to Thomas.[5] Although Dobbins, Brown, and Thomas each had unique job responsibilities, they engaged in the "same basic conduct." They all worked in The Credit Union's IT Department. *Cf. Lewis*, 918 F.3d at 1227 (explaining how "minor differences in job function [will not] disqualify a would-be comparator"). Second, Dobbins, Brown, and Thomas were all subject to The Credit Union's employment policies. (*See* Docs. 30–4, 30–5.) Third, all three were "under the jurisdiction of" IT Director King. However, to show The

---

[5] Thomas also offered King as a comparator. (Doc. 34 at 27.) King was not similarly-situated to Thomas because the two did not engage in the "same basic conduct." Unlike Thomas, King managed the department, developed and maintained budgets, supervised all IT employees, and led performance evaluations. (Doc. 30–18 at ¶¶ 4, 10.)

Credit Union treated Dobbins and Brown more favorably, Thomas offered only conclusory statements. (Doc. 34 at 27.) For instance, Thomas's brief says, "Thomas has demonstrated [The Credit Union] treated similarly-situated non-African American employees . . . more favorably without just legal cause to do so." (*Id.*) Those conclusory statements are not enough to create a question of fact.

Even if Thomas satisfied the comparator requirement, he did not show he was qualified for the job benefit at issue—a better 2017 evaluation. Thomas's brief looks only to the past. Before 2017, he argues, "he consistently received the highest job evaluations in the IT Department." (Doc. 34 at 27.) But he never explains how his 2017 evaluations were unfair or incorrect. (*Id.*) How Thomas performed in 2014, 2015, and 2016 is a separate question from how he performed in 2017. Having presented no argument as to *that* question, Thomas failed to show the fourth element of a prima facie case.

Further, even if Thomas met his prima facie burden, which he did not, The Credit Union produced a non-discriminatory explanation for Thomas's lower 2017 evaluations. In 2017, The Credit Union changed its evaluation criteria. (Doc. 30–17 at 54–60.) Rather than start at "Excellent" and deviate downward (like in previous years), evaluators started in the middle of the grading spectrum and deviated upward or downward from there. (*Id.*) According to Fleming, "all of the employees in the IT

Department received lower evaluations" under the new criteria. (*Id.*) Having produced this non-discriminatory explanation, The Credit Union satisfied its burden under *McDonnell Douglas*'s second prong. *See Watkins*, 153 F.3d at 1314.

Because The Credit Union produced a non-discriminatory reason for Thomas's 2017 evaluations, the burden again shifts to Thomas. *McDonnell Douglas*, 411 U.S. at 804. Thomas must show "both that the [proffered] reason was false, *and* that discrimination was the real reason." *Springer*, 509 F.3d at 1349 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Again, he meets his burden "either directly by persuading the court that a discriminatory reason more likely motivated [The Credit Union] or indirectly by showing that [The Credit Union's] proffered explanation is unworthy of credence." *Kragor*, 702 F.3d at 1308.

The following deposition testimony lays out Thomas's scant evidence of pretext:

> **Thomas:** My review was worse than [Dobbins's and Brown's]. After I explained how my review was, I think [Dobbins] may have said, mine wasn't that bad. I think [Brown] said something similar.
>
> . . .
>
> **Q:** What evidence do you have that this performance review was discriminatory based on your race?
>
> **Thomas:** Basically after what [Dobbins and Brown] said about their review.

**Q:** Okay. But there's nothing in your review about race; was it?

**Thomas:** No.

**Q:** And [your evaluator] never mentioned anything in the conversation . . . about your race; did he?

**Thomas:** He did not.

**Q:** Now, he didn't attribute anything to race; did he?

**Thomas:** No.

. . .

**Q:** Okay. Do you have any [other] evidence that your performance review as it is is based on your race?

**Thomas:** I do not.

. . .

**Q:** Okay. Isn't it equally possible that they just decided to have a more stringent review moving forward?

**Thomas:** That's possible.

(Doc. 30–1 at 198–99)

Thomas failed to show The Credit Union's proffered explanation was pretext for race discrimination. As his deposition shows, Thomas's sole argument is that Dobbins and Brown received better evaluations and better pay raises than he received. (Doc. 34 at 27.) True enough, a plaintiff can use similarly-situated comparators to show pretext. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253,

1259 (11th Cir. 2001) (Court examined similarly-situated comparators while weighing a plaintiff's pretext argument). Here, however, Thomas's comparator evidence fails to "persuade the court." For one, Dobbins and Brown also received worse reviews under the 2017 scoring criteria. (Doc. 30–18 at ¶ 27.) Both of their overall scores dropped by thirteen points—only three points less than Thomas's sixteen-point drop. (*Id.*) Second, another Caucasian employee's (Emily Farris) score dropped sixteen points under the new criteria. (*Id.*) Because Caucasian employees saw similar or synonymous drops under the 2017 evaluation criteria, Thomas didn't directly show pretext, didn't indirectly show The Credit Union's explanation is "unworthy of credence," and didn't show racial animus motivated his 2017 evaluations.

### C.   Two-Week Notice

On March 18, 2018, Thomas resigned from The Credit Union for a better-paying position at Southern Linc. (Doc. 30–1 at 79–82, 224.) According to Thomas, The Credit Union then racially discriminated against him by not allowing him to work his two-week notice period. (Doc. 34 at 26–27.) An excerpt from Thomas's deposition details the alleged discrimination and The Credit Union's explanation:

> **Q:** In your complaint, one of the allegations you made is that you gave your two-week notice and you weren't allowed to work that two weeks; right?

**Thomas:** Right.

**Q:** But you were paid for those two weeks; correct?

**Thomas:** Correct.

**Q:** So you didn't have any loss in pay?

**Thomas:** I did not.

**Q:** Okay. The reason you were provided that they went ahead and paid you was that you were responsible for the network and the firewall, that's the reason they decided to go ahead and allow you . . . not to have to work those two weeks; is that right?

**Thomas:** I guess that's right.
. . .

**Q: . . .** Would it be unusual to you that [when] someone in IT resigned, that a company went ahead and cut them off at that point—

**Thomas:** To me, that would not be.

**Q:** --because of all the access that you would have; right?

**Thomas:** Correct.

**Q:** Do you have any evidence that the decision to go ahead and cut you off as of the date of your notice was discriminatory based on your race or sex?

**Thomas:** I don't have any evidence.

(Doc. 30–1 at 83–84.)

Thomas's two-week-notice disparate-treatment claim fails for two reasons.

First, he faced no adverse employment action. *See Crawford v. Carroll*, 529 F.3d 961,

970 (11th Cir. 2008) (disparate-treatment claims must show an adverse employment action). Second, he did not rebut The Credit Union's non-discriminatory explanation for why it paid Thomas in lieu of him working the notice period.

Thomas suffered no adverse employment action. Adverse employment actions are "ultimate employment decisions, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)). Thomas's allegation does not fall within *Gupta*'s definition. Not allowing Thomas to work the notice period in no way altered his compensation; The Credit Union paid him for both unworked weeks. And, because Thomas resigned (ending his employment), not allowing him to work two weeks post-resignation did not "adversely affect his status as an employee" or alter the terms, conditions, or privileges of his (non)employment.[6]

---

[6] Although the Eleventh Circuit has not, to this Court's knowledge, answered whether paid but unworked notice periods are adverse employment actions, many district courts have. *See, e.g.*, *Tanniehill v. Ball Healthcare*, No. 2:08-cv-01387-HGD, 2010 WL 11614278, at *8 (N.D. Ala. May 18, 2010) (accepting resignation without allowing plaintiff to work notice period wasn't adverse "because plaintiff was paid for the rest of the month, even though she did not actually perform any work"); *Wynn v. Paragon Sys., Inc.*, 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004) ("Paragon's decision to reject Wynn's offer to work through a two week notice period does not constitute an adverse employment action.").

Even if Thomas suffered an adverse employment action, and even if Thomas could show the other prima facie elements for disparate-treatment, The Credit Union offered a non-discriminatory reason for not allowing Thomas to work the notice period. By Thomas's own admission (Doc. 30–1 at 83–84), allowing IT staff to work post-resignation is a security risk because they can access sensitive information. Even Thomas recognizes it's not unusual to limit that access once an IT staff member resigns. (*Id.*) Because The Credit Union offered this non-discriminatory reason, and because Thomas offered little-to-no evidence of pretext, summary judgment on Thomas's two-week-notice claim is due to be granted.

## II.    Hostile Work Environment

For a hostile-work-environment claim based on sexual harassment to survive summary judgment, the plaintiff must meet five elements. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). First, the plaintiff must belong to a protected group. *Id.* Defendants do not dispute that Thomas belongs to a protected group. Second, the plaintiff must show he or she was subject to unwelcome sexual harassment, "such as sexual advances, requests for sexual favors, and other conduct of a sexual nature." *Id.* Third, the plaintiff must show the harassment "was based on [his or her] sex." *Id.* "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are

not counted." *Gupta*, 212 F.3d at 583 (also explaining that Title VII is not "a general civility code"). Fourth, the plaintiff must show "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment." *Reeves*, 594 F.3d at 808. Fifth, the plaintiff must show some basis for holding his or her employer liable. *Id.*

Thomas alleges the following:[7]

- Kasheena Hall, a female employee, allegedly said she liked how Thomas's jeans fit and liked the way he walked. She also allegedly told Thomas he had "a nice bulge" in his pants. (Doc. 30–1 at 94–95.)

- On March 1, 2016, Hall accessed Thomas's iPower information. (*Id.* at 90.) Thomas doesn't know how much information Hall accessed; he only knows that, through iPower, Hall learned his personal email address. (*Id.*) She sent an email to that personal address, but Thomas admits the email was not sexual. (*Id.* at 93.) Thomas complained to HR Manager Dickey the next day both about Hall's comments and about her using iPower to access Thomas's email address. (*Id.* at 94.) Dickey promised Thomas she would "say something" to Hall. (*Id.* at 96.)

---

[7] Some of the alleged harassment may have happened more than 180 days before Thomas filed his EEOC charge. According to The Credit Union, the Court cannot consider any alleged harassment that happened before that 180-day window. (Doc. 29 at 24.) In 2002, the Supreme Court rejected The Credit Union's argument. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). Since *Morgan*, the Eleventh Circuit has also routinely rejected it. *See e.g.*, *Shields v. Fort James Corp.*, 305 F.3d 1280, 1281–82 (11th Cir. 2002) ("[A] hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations . . . Put simply, if the smallest portion of that 'practice' occurred within the limitations time period, the court should consider it as a whole."); *Stewart v. Jones Util. and Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) (explaining how "the entire time period of the hostile environment can be considered . . . for the purposes of determining liability if an act relating to the claim occurred within the filing period"). Because The Credit Union does not argue *all* the alleged harassment happened outside the 180-day window (*see* Doc. 36 at 8), the Court considers the older allegations.

o   After Thomas complained to Dickey, Hall allegedly made "little noises" at him "like she was whistling, like hey, cutie, stuff like that." (*Id.* at 97.) She also allegedly wrote and sent Thomas a letter. (*Id.* at 96–97.) Thomas admits the letter contained no sexual content. (*Id.* at 96, 160.) Although he didn't report the whistling to Dickey, Thomas claims he complained to Brittany Edgeworth, the HR assistant (*id.* at 98), and Edgeworth suggested Thomas should tell Dickey. (*Id.* at 99.) Then, as Thomas walked off, he contends Edgeworth told him he "shouldn't look so enticing" if he did not want the comments to continue. (*Id.* at 102.)

o   Sometime before August 27, 2015, Tammy Ewing, another female employee, allegedly "pulled out a vibrator and said 'imagine what me and you could do with this.'" (*Id.* at 87, 142.) Thomas claims he reported this to Dickey on March 2, 2016. (*Id.* at 143.)

o   Sometime before August 27, 2015, Kim Smith allegedly told Thomas, "Damn, I see what everyone has been talking about." (*Id.* at 142–43.) Thomas reported this to Dickey on March 2, 2016. (*Id.*) According to Thomas, then-CIO Tim Powell overheard Smith's comment. (*Id.*)

o   Teresa Birchfield, another female employee, "made those same kind of, like, inappropriate comments." (*Id.* at 87.) Thomas can point to only one specific comment. "[I]t was something on the line of—I can't remember the exact words, but something like 'you are cute like everybody else says.'" (*Id.* at 144–55.)

o   Once, when Thomas helped Birchfield with her computer, he saw his name and his son's name in her search history. (*Id.* at 145.) Birchfield allegedly had searched their names in iPower. (*Id.*). When Thomas confronted her, she responded, "I wanted to see how old you were." (*Id.*) Thomas reported this to King, and King determined Birchfield could only access Thomas's "basic information" like "name, address and phone number . . . and date of birth." (*Id.* at 147.)

o   According to Thomas, female employee Cindy Johns told him she liked his walk, liked his tight pants, and said Thomas should "meet [her] in

the elevator." (*Id.* at 102.) Thomas claims he reported this to Dickey. (*Id.*)

o   Thomas and Johns had extensive and sometimes sexual texting conversations. (*See* Doc. 30–12.) For instance, Johns allegedly texted Thomas the following: "Pull my hair and deepthroat me." (*Id.* at 2.) Thomas responded, "Let's do it." (*Id.*) On another occasion, Johns allegedly texted Thomas the word "Naked." (*Id.*) Thomas sent back a picture of a smiling and half-naked man standing in a shower. (*Id.*) According to Thomas, he neither wanted nor enjoyed these conversations. (Doc. 30–1 at 115.) He calls his responses "sarcasm" and says participation was a "defense mechanism." (*Id.*)

o   One day, according to Thomas, Johns entered his office and flashed him her bare breasts. (*Id.* at 106–07.) According to Thomas, Johns soon texted him. (*Id.* at 106.) She asked, "I take it you like what you seen?" (*Id.* at 106; Doc. 30–3 at 2.) He allegedly responded, "Mm y not . . . Didn't see much though." (Doc. 30–3 at 2.) Again, Thomas says his responses were a "defense mechanism" (Doc. 30–1 at 108), and he says he reported the flashing to IT Director King. (*Id.* at 111.)

Viewing the evidence in Thomas's favor, he was "subject to unwelcome sexual harassment." A jury *could* find the comments about his appearance, the comments about the "bulge" in his pants, the whistling, and the vibrator incident to be sexual harassment. At minimum, to quote *Reeves*, this was "conduct of a sexual nature." Further, based on Thomas's testimony and his complaints to Dickey, Edgeworth, and King, a jury could find that at least some of the harassment was "unwelcome."

Thomas also showed some of the alleged harassment was "based on his sex." Some of the alleged incidents were, by Thomas's own admission, non-sexual.

Thomas admits that Hall's emails and letter contained no sexual content (Doc. 30–1 at 97, 160), and there's nothing sexual about Birchfield accessing Thomas's contact information. The Court does not consider these incidents. *Gupta*, 212 F.3d at 583. However, other alleged incidents (the comments, the vibrator, etc.) were potentially less-innocuous. Therefore, drawing all reasonable inferences in Thomas's favor, he faced some sex-based harassment.

As to element four, Thomas must show the alleged sex-based harassment was "sufficiently severe or pervasive." *See Reeves*, 594 F.3d at 808. Element four has both a subjective as well as an objective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Thomas must subjectively perceive the work environment to be abusive. *Id.* at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). Thomas's deposition testimony is relevant for the subjective inquiry. *See Hulsey v. Pride Rests., LLC.*, 367 F.3d 1238, 1248 (11th Cir. 2004) (looking to the plaintiff's deposition for subjectivity analysis). Thomas must also show the harassment was objectively severe or pervasive enough to alter the terms and conditions of his employment. *Harris*, 510 U.S. at 21. Courts use four factors for this objective inquiry: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

humiliating; and (4) whether the conduct unreasonably interfered with the employee's job performance. *Mendoza v. Borden Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

Although Thomas's testimony and his complaints to Dickey, Edgeworth, and King create a question of fact as to element four's subjective component, his claim fails under the objective component. First, Thomas's allegations, if true, do not rise to the level of "frequent" harassment. Over roughly a two-year period, Thomas alleges a few comments, whistling and "noises," a flashing incident, and the texting conversations with Johns.[8]   The Eleventh Circuit requires much more for a finding of frequency. *Compare Guthrie v. Waffle House*, 460 F. App'x 803, 807 (11th Cir. 2012) (calling "a few dozen comments or actions" over an eleven-month period infrequent) *with Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1277 (11th Cir. 2002) (finding frequency where a co-worker "hurled ethnic slurs" at the plaintiff "three to four times a day"). Second, the texting with Johns and the flashing incident are the only allegations that could potentially qualify as "severe," and the evidence suggests Thomas was a willing participant in both. He responded to her messages and, by his own admission, he never asked Johns to stop texting him. (Doc. 30–1 at 115.)   Third, nothing suggests Thomas suffered "physically threatening"

---

[8] Again, the Court does not consider non-sexual allegations. *Gupta*, 594 F.3d at 798.

harassment. And, finally, Thomas did not submit objective evidence showing sexual harassment *unreasonably* interfered with his job performance. *See Gupta*, 212 F.3d at 586 (finding insufficient evidence of an unreasonable job interference even though the plaintiff testified that, because of harassment, she suffered "depression, nervousness, anxiety, nose bleeds, fatigue, [and] weight gain"). Considering all four factors, no jury could find harassment objectively altered the conditions of Thomas's employment.

Further, Thomas submitted little evidence regarding The Credit Union's liability. To hold The Credit Union liable, Thomas must show The Credit Union had (a) actual or constructive knowledge of the hostile environment and (b) failed to take "immediate and appropriate corrective action." *Watson v. Blue Circle Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003). Other than the incidents involving Johns, most alleged sexual harassment stopped soon after Thomas complained to management. This suggests The Credit Union took appropriate corrective action.

The Credit Union's response aside, Thomas's claim fails under element four's objective component. Therefore, summary judgment is due to be granted as to Thomas's hostile-work-environment claim.

### III.   Tort Claims

Thomas seeks to hold The Credit Union vicariously liable for outrage and invasion of privacy. He also sued The Credit Union directly for negligent and wanton supervision, training, and retention. The Credit Union's motion for summary judgment as to all these state-law claims is due to be granted.

### A.   Outrage

The tort of outrage has three elements: (1) the defendant acted intentionally or recklessly, (2) his conduct was extreme and outrageous, and (3) that conduct caused emotional distress "so severe that no reasonable person could be expected to endure it." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). By "extreme," the Alabama Supreme Court means "conduct so outrageous in character and so extreme in degree as go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (quoting *Am. Road. Serv. v. Inmon*, 771 So. 2d 462, 465 (Ala. 2000)).

In *Busby*, Alabama's Supreme Court held that sometimes, in extreme circumstances, sexual harassment can rise to the level of outrage. *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989). Rather than describe what forms of sexual harassment are "atrocious and utterly intolerable in a civilized society," *Busby* lists

seventeen incidents of sexual harassment and then, with one sentence, holds, "The deposition evidence presented by the plaintiffs presents evidence from which a jury could reasonably determine that [the defendant's] conduct rose to this level." *Id.* Because *Busby* offers little reasoning, the Court can only compare the *Busby* allegations to Thomas's allegations.

Thomas's sexual harassment allegations are less numerous and less severe than those raised in *Busby*. In *Busby*, a supervisor told his employees he would "put a stick in their [work] machines so they could masturbate while working" and said he wished the plaintiffs "would come to work braless and wear less clothing." *Id.* at 324. He asked one plaintiff to "accompany him to the restroom and hold his penis while he urinated," he followed a plaintiff into the restroom, he followed another plaintiff after work, and he "openly stared" at a plaintiff's sexual anatomy. *Id.* Because Thomas's alleged harassment doesn't approach this level of severity, summary judgment as to his outrage claim is due to be granted. *See Potts*, 771 So. 2d at 465 (describing outrage as "an extremely limited cause of action").

### B.   Invasion of Privacy

Thomas's brief relies on a single incident to show an invasion of privacy: Birchfield using iPower to access "basic information" about Thomas. (Doc. 34 at

32.) Again, King confirmed that Birchfield could only access Thomas's name, address, phone number, and date of birth. (Doc. 30–1 at 147.)

Invasion of privacy is the "intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Rosen v. Montgomery Surgical Ctr.*, 825 So. 2d 735, 738 (Ala. 2001) (quoting *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1178 (Ala. 1995)). As Alabama's Supreme Court has explained:

> Invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*S.B. v. Saint James Sch.*, 959 So. 2d 72, 90 (Ala. 2006).

Thomas's invasion-of-privacy claim fails as a matter of law. Thomas argues that, by accessing his name, address, phone number, and date of birth, Birchfield caused him "mental suffering, shame, and humiliation." Even if that's true, Birchfield's actions would not so affect a person of ordinary sensibilities. Because all invasion-of-privacy claims involving sexual harassment must be outrageous, shameful, and humiliating to a reasonable person (*Ex Parte Atmore Community Hospital*, 719 So. 2d 1190, 1194 (Ala.

1998)), and because no authority suggests Birchfield's actions rise to this level, summary judgment is due to be granted.

### C. Negligent and/or Wanton Supervision, Training, and Retention

To prevail on a claim for negligent or wanton supervision, training, and/or retention, a plaintiff must show an employer's employee committed a common-law tort. *Ex Parte Transp. Leasing Corp*, 128 So. 3d 722, 728 (Ala. 2013) ("Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee.") (quoting *Smith v. Boyd Bros. Transp. Inc.*, 406 F. Supp. 2d 1238, 1248 (M.D. Ala. 2005)); *see also Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort."). Because Alabama recognizes no independent tort for sexual harassment, *see Machin v. Childersburg Bancorporation*, 761 So. 2d 981, 983 n.1 (Ala. 1999), and because the two torts alleged by Thomas fail, summary judgment is due to be granted as to this claim.

## ANALYSIS: MOTION TO STRIKE

The Credit Union's motion to strike makes two arguments. First, it argues Thomas's reply brief should be stricken because it does not comply with this Court's Uniform Initial Order. (Doc. 35 at 1–8.) The Credit Union says Thomas's reply exceeds the page limit by three pages, discusses irrelevant information, and does not properly respond to The Credit Union's undisputed facts. (*Id.*) After careful consideration, the Court denies this first argument. Second, The Credit Union moved to strike Thomas's unsigned affidavit. (*Id.* at 8.) Because Thomas never filed the unsigned affidavit—and because the Court therefore never considered or cited it in this Memorandum of Opinion—this second argument is terminated as moot.

## CONCLUSION

As explained above, The Credit Union's motion for summary judgment (Doc. 28) is due to be GRANTED. The Credit Union's motion to strike (Doc. 35) is due to be DENIED IN PART and TERMINATED AS MOOT IN PART. The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on November 5, 2020.

L. Scott Coogler
United States District Judge

203323